IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA,

v.

BRANDON ASBERRY (9)

CRIMINAL ACTION FILE NO.

1:16-CR-427-AT-JKL-9

## ORDER AND NON-FINAL REPORT AND RECOMMENDATION

This Order and Non-Final Report and Recommendation addresses the following pending motions filed by Defendant Brandon Asberry:

- Motion for Bill of Particulars [Doc. 635];

- Motion to Suppress Physical Evidence [Doc. 636];

- Motion for Timely Disclosure of Deals and Information About Government Witnesses [Doc. 637];

- Motion for Timely Disclosure of Confidential Informants with Related Evidence [Doc. 638]; and

- Motion to Strike Surplusage from Count One of the Indictment [Doc. 639].

The Court first summarizes the relevant allegations in the superseding indictment. Then, the Court addresses motions in the following order: (1) the

Motion to Suppress; (2) the Motion for Bill of Particulars; (3) the Motions for Timely Disclosure; and (4) the Motion to Strike Surplusage.

## I.    SUMMARY OF SUPERSEDING INDICTMENT

Asberry is charged in the superseding indictment with Racketeer Influenced and Corrupt Organizations Act ("RICO") conspiracy (Count 1), Violent Crimes in Aid of Racketeering Activity ("VICAR") murder conspiracy (Count 7), and conspiracy to distribute controlled substances (Count 8). [Doc. 33.] In Count One, the superseding indictment alleges that Asberry was a member of the Nine Trey Gangsters, a street gang with members in New York, Georgia, and other southeastern states. [*Id.* at 3-4, 14.] It traces its origins to the United Blood Nation, a gang alliance that formed at Rikers Island in New York in the early 1990s that is also loosely affiliated with the Bloods gang of Los Angeles. [*Id.* at 3.] The superseding indictment alleges that the Nine Trey Gangsters operated as a racketeering enterprise as defined by 18 U.S.C. § 1961(4). [*Id.* at 12.]

As to Asberry's personal participation in the activities of the Nine Trey Gangsters, the superseding indictment alleges that, on August 4, 2016, he was told by alleged Nine Trey Gangsters member Defendant Tyrone Clark to call a gang leader about acquiring heroin (Overt Act 17). [Doc. 33 at 22.] On August 15,

2016, Asberry bought drugs on credit from another alleged Nine Trey Gangsters member, Defendant Joseph Riley (Overt Act 26). [*Id.* at 23.] On August 26, 2017, Asberry and other alleged members attended a gang meeting at the "Billy Spot," a northwest Atlanta apartment where Nine Trey Gangsters members stored contraband and held meetings (Overt Act 35). [*Id.* at 21, 24.] Asberry participated in a September 8, 2016 phone call with at least one other gang member, during which the collection of members' dues money was discussed (Overt Act 42). [*Id.* at 25-26.] On September 10, 2016, fellow alleged Nine Trey Gangsters member Defendant Khajavius Mitchell sold Asberry Xanax pills (Overt Act 50). [*Id.* at 27.] Asberry attended another gang meeting at the Billy Spot on September 24, 2016 (Overt Act 87). [*Id.* at 33.] Two days later, on September 26, 2016, Nine Trey Gangsters members arranged for Asberry and others to go to the house of a rival gang member to recover some money and kill the persons who had pointed guns at a Nine Trey Gangsters member earlier that day (Overt Act 95). [*Id.* at 34-35.] Also on September 26, 2016, Asberry and others possessed firearms (Overt Act 97). [*Id.*]

The alleged conduct at issue in Overt Acts 95 and 97 and Count 7 precipitated a traffic stop and Asberry's arrest.  That alleged conduct is at issue in Asberry's motion to suppress and is therefore discussed in more detail below.

## II.   MOTION TO SUPPRESS

Asberry moves to suppress physical evidence seized pursuant to a traffic stop and warrantless search of a car, which occurred on September 26, 2016.  [Doc. 636.]  The government argues that the traffic stop was supported by reasonable suspicion, based on wiretaps and surveillance, that Asberry and other occupants of the car were engaged in criminal activity, namely, that they were on their way to conduct a retaliatory shooting in the Mechanicsville neighborhood of Atlanta.  [Doc. 896 at 12-15.]  The government also argues that the search of the car was lawful because a magazine and rifle ammunition were in plain view in the car and law enforcement had probable cause to believe the car contained contraband and evidence of a crime.   [*Id.* at 16-19.]   Asberry disputes the government's interpretation of the wiretapped calls, argues that the government fabricated a confidential informant, argues that the government failed to demonstrate that its investigators relied on the wiretaps, and contends that the vehicle stop was not supported by probable cause.  [Docs. 970, 971.]

4

On December 11, 2018, I held an evidentiary hearing on the motions to suppress filed by Asberry and two co-defendants, Cetera Bowles-Griffin and Wajzim Reed, who are also alleged to be Nine Trey Gangsters members.  Detective Mark Belknap with the Atlanta Police Department ("APD"), Special Agent Buddy Early with the Federal Bureau of Investigation ("FBI"), and Task Force Officer ("TFO") William Murdock testified at the hearing.  [Docs. 851, 860.]  Citations to the transcript of the evidentiary hearing [Doc. 860] appear as "Tr."  Transcripts of wiretapped conversations [Doc. 853-1 at 1-65] were also admitted at the evidentiary hearing (Tr. 118).  The evidence adduced at the hearing is presented below.

**A.    Facts**

Detective Belknap testified that, as a member of the U.S. Marshals Service Southeast Regional Fugitive Task Force, he took part in an investigation into the Nine Trey Gangsters.  (Tr. 4-6.)  Detective Belknap worked shifts in the "wire room," where law enforcement intercepted calls from the phones of Nine Trey Gangsters members.  (Tr. 6.)  Special Agent Early also testified that he was involved with the Nine Trey Gangsters investigation and had shifts monitoring calls in the wire room.  (Tr. 102-03.)  In the days leading up to September 26, 2016,

5

investigators became aware through their wiretap investigation that the Nine Trey Gangsters gang had been the target of a robbery or theft of money.  (Tr. 103-04.) Gang members were "upset and agitated" and wanted to "go[] after the person . . . they believed had stolen the money" from them.  (Tr. 104; *see also* Tr. 7.) Furthermore, on September 25, 2016, Defendant Khajavious Mitchell had been arrested after leaving a gang meeting at the "Billy Spot," the apartment in northwest Atlanta where the Nine Trey Gangsters conducted meetings and stored contraband. *See* (Tr. 135-36, 155); *see also* [Doc. 853-1 at 20, 25].

On the morning of September 26, 2016, investigators intercepted calls on Defendant Tyrone Clark's phone about the stolen money and Mitchell's arrest. [Doc. 853-1 at 1-65.]  Clark and Defendant Joseph Riley had recently learned that a Nine Trey Gangsters member called "Sellio" had taken the money. [*See id.* at 1-18.]  Sellio apparently had admitted to the theft to Defendants J'Mon Hawkins and Tashied Reed, also alleged Nine Trey Gangsters members.  [*Id.* at 24.]  Sellio is Tashied Reed's brother and Mitchell's half-brother.  [*Id.* at 10, 24, 50-51.]  Sellio told Tashied Reed that he had hidden the money in a house associated with a member of the Good Fellas street gang in the Atlanta neighborhood of Mechanicsville (the "Good Fellas house").  [*Id.* at 13, 16]; *see also* (Tr. 105).

6

During a call with Clark that began at 10:10 a.m. on September 26, 2016, Riley stated that Tashied Reed was in Mechanicsville trying to get the stolen money back. [Doc. 853-1 at 4.] Tashied Reed was there without a car and was unarmed.[1] Clark took a call-waiting call from Asberry, who said that he was in Norcross but was going to get Tashied Reed. [*Id.* at 6.] Clark instructed Asberry to "take the stick." [*Id.*] Special Agent Early testified at the evidentiary hearing that the term "stick" refers to a firearm. (Tr. 115, 155.)

Riley and Clark then had a multi-party call with Tashied Reed, Sellio, and an unidentified man. [Doc. 853-1 at 8-9.] The unidentified man indicated that he wanted to resolve the issue with the Nine Trey Gangsters and was concerned because his family lived in the Good Fellas house. [*Id.* at 9.] He offered to "hold" Sellio until the Nine Trey Gangsters came to get him. After the call with Sellio and the unidentified man, Tashied Reed expressed his distrust for the people in the Good Fellas house, and Riley reassured him that Asberry was "on the way right

---

[1] Clark knew that Tashied Reed's "strap" (a firearm (Tr. 156)) had been confiscated the day before. [Doc. 853-1 at 24.] Tashied Reed also repeatedly asked Riley and Clark to send someone in a G-ride, (a car (Tr. 156)), to pick him up. [*Id.* at 4, 9, 33-34, 36, 44.]

now with the stick." [*Id.*; *see also id.* at 11.]  Discussing Sellio, Tashied Reed

stated:

> I swear I'm finna beat the life.  I'm finna damn near kill this man . . .
> straight up.  And that is just between me.  This ain't got shit to do with
> y'all.  I'm finna mow the [man].  I'm finna kill this man out here
> bro. . . .  Man that's both our little brothers.  That['s] [Mitchell's] little
> brother too, on our Daddy's side you feel me.  Damn [that's] both our
> little brother bro.  Real, shit you did that to your own brother.

[*Id.* at 9-10.]  Tashied Reed then hung up to take a call from Asberry.  [*Id.* at 10.]

At 10:29 a.m., Clark called Riley, and they continued to discuss Sellio's theft

of the money.  [Doc. 853-1 at 11-13.]  Clark reiterated that Asberry had a "stick"

and was going to meet Tashied Reed.  [Doc. 853-1 at 11.]  Bowles-Griffin and

Hawkins joined the call, and they continued to discuss the theft.  [*Id.* at 13-14.]

Bowles-Griffin also stated that she was on her way to court to support Mitchell.

[*Id.* at 14.]  Riley heard from Tashied Reed during the call and reported that Tashied

Reed wanted Asberry "to come get him now" because he was worried about his

safety.  [*Id.* at 15-16.]  Hawkins stated that he was planning to get a "stick" from

Riley and expressed concern about Asberry and Tashied Reed "pull[ing] up" in

Mechanicsville by themselves.  [*Id.* at 16-17.]  Clark told Hawkins that Asberry

was coming from Gwinnett County, so there was some time before Asberry would

arrive.  [*Id.* at 17.]

At 10:43 a.m., Clark spoke to Archie Arvin and related the news about Mitchell's arrest and the situation with Sellio. [Doc. 853-1 at 20.] Clark stated, "[I]t's probably going to be shootout in Mechanicsville." [*Id.*] Clark then spoke Riley again and confirmed that Asberry was leaving to pick up Tashied Reed. [*Id.* at 22.] Clark called Arvin again. Regarding Sellio seeking help from the Good Fellas, Clark remarked, "That shit ain't goin to save him. . . . [They] put their hands on that boy knowing that- what he just did . . . they-they want war." [*Id.* at 24-25.]

At 11:03 a.m., Clark called Riley, and Clark said that Tashied Reed needed more than one car and "as many bros . . . as possible" to "pull up" at the Good Fellas house. [Doc. 853-1 at 29.] Riley reported that he had just discussed the Sellio situation with someone named "Tweet."[2] Tweet was indifferent to the situation, which he saw as a "brother on brother" problem and not a dispute between Bloods and Good Fellas. Riley told Clark that he could "greenlight that shit." Riley asked how many people were with the money, and Clark stated he thought there were two and that four Nine Trey Gangsters members with two guns could retrieve the money. Riley believed that the unidentified man they had spoken

---

[2] The government indicates in its brief that Tweet is a leader in the Good Fellas gang.

9

to on the conference call did not want any trouble.  Clark speculated that the man was "trying to protect the [Good Fellas] house by saying they people in there." [*Id.*]  A few minutes later, Riley called Clark back and indicated that someone identified as "Jimmy" had found a car and was "mounting up now" to assist Tashied Reed.  [*Id.* at 32.]

At about 11:20 a.m., investigators conducting surveillance on the Billy Spot in northwest Atlanta observed Hawkins and Defendant Alphonso Nalls, another alleged Nine Trey Gangsters member, outside the apartment.[3]  [Doc. 853-1 at 81.] Fifteen minutes later, Bowles-Griffin arrived in a white Chevrolet Cavalier and picked up what investigators believed to be a firearm.  (Tr. 10); [Doc. 853-1 at 82-83].  Specifically, investigators witnessed Nalls placing a "bundled up" black and pink blanket in Bowles-Griffin's car.  (Tr. 10); [Doc. 853-1 at 83.]  Bowles-Griffin drove away from the Billy Spot alone.  [Doc. 853-1 at 83.]

At 11:38 a.m., Clark called Tashied Reed, who was increasingly frustrated and angry because people in Mechanicsville were "drawing down" on him and felt

---

[3] The task force investigators' September 26, 2016 surveillance report documenting surveillance on the Nine Trey Gangsters at the Billy Spot and in the Summerhill neighborhood [Doc. 853-1 at 82-83] was admitted into evidence at the hearing.  (Tr. 157-59.)  The Court refers to that report here to provide additional factual context.

as though he had been left "for dead" by the Nine Trey Gangsters.  [Doc. 853-1 at 33-34.]  A few minutes later, Clark called Asberry for an update on his location and Asberry reported that he was only five minutes from Tashied Reed.  [*Id.* at 39.]  At 12:03 p.m., Clark called Riley, and Riley told him that Bowles-Griffin had picked up the "Draco."[4] [*Id.* at 41.]  Clark expressed concern that the group was taking only two firearms, telling Riley, "They should have still came and got your stick.  They, they need to shatter that apartment.  They need to shatter that [building], like knock the building down."  [*Id.*]

Meanwhile, investigators were disbursed throughout Atlanta in order to stop or mitigate the violence they feared might come of the escalating situation.  (Tr. 7, 104-05.)  The investigative team remained in contact by radio and cell phone.  (Tr. 105.)  Detective Belknap testified that investigators believed the Nine Trey Gangsters were picking up firearms and meeting up with each other in order to go "to a specific location to shoot a specific person."  (Tr. 7.)  Special Agent Early testified that gang members were attempting to obtain firearms and rally troops to retaliate or resolve the robbery issue.  (Tr. 104.)  Detective Belknap drove to Atlanta's Summerhill neighborhood, which is near Mechanicsville.  (Tr. 7, 9.)  In

---

[4] The Draco is a firearm.  (Tr. 155.)

11

Summerhill, at about 12:25 p.m., he located Bowles-Griffin's white Chevy Cavalier sedan, saw her pick up Tashied Reed, and radioed uniformed APD officers for assistance with a traffic stop.  (Tr. 7); [Doc. 853-1 at 82].  Other investigators tailed the car through Summerhill.  (Tr. 8); [Doc. 853-1 at 82-83].  At about 12:30 p.m., the Chevy "linked up" with a black Cadillac CTS.  (Tr. 8); [Doc. 853-1 at 83].

While officers were looking for the suspects and then while they were tailing them through the Summerhill neighborhood, at 12:23 p.m., Clark called Tashied Reed, who was at that point in the car with Bowles-Griffin.  [Doc. 853-1 at 54.] Tashied Reed told Clark that Bowles-Griffin had obtained a "stick," but Hawkins and others at the Billy Spot had not joined her.  [*Id.*]  Tashied Reed complained that other members were making excuses and gave Clark his location so "more bros" could come meet him.  [*Id.* at 54-55.]  At about 12:32 p.m., APD officers in marked patrol cars conducted a traffic stop of the Chevy and the Cadillac.  (Tr. 9, 158); [Doc. 853-1 at 60, 83].  Clark participated in conference calls with Bowles-Griffin, Riley, Mitchell (who was calling from the Fulton County jail), and others during the traffic stop.  [Doc. 853-1 at 58-65.]

Patrol officers made initial contact with the occupants of the cars, and the occupants were either asked to step out of the cars or removed from the cars.  (Tr.

10, 109.)  Officer Belknap and Special Agent Early spoke with Bowles-Griffin first and asked her for permission to search the car, and she gave consent to the search both orally and in writing.  (Tr. 10-11, 110-12); [Doc. 853-1 at 69].  On the front passenger-side floorboard of the Chevy, officers found the black and pink blanket, which they unwrapped, discovering a small AK-47-style assault rifle.  (Tr. 13-14, 18, 112.)

Officer Belknap and Special Agent Early then went to speak with the occupants of the Cadillac: Asberry, Wajzim Reed, and Avery Anderson.  (Tr. 14, 29, 48, 114.)  The driver—Anderson—indicated that the car was Asberry's, and Asberry stated that the car belonged to a family member.  Officer Belknap noticed the odor of fresh marijuana as he approached the Cadillac.  (Tr. 14, 48.)  Because the door was open, Officer Belknap could see into the car and saw a plastic bag in the center console, an assault rifle magazine near the driver's seat, and a box of rifle ammunition near the front passenger's seat.  (*Id.* at 15-16.)  Special Agent Early saw the box of ammunition through the open door.  (Tr. 116.)  Upon fully searching the Cadillac, officers discovered in the trunk an SKS rifle partially covered by a blanket with a red bandana tied around the barrel.  (*Id.* at 17, 117.)  Detective Belknap testified that the red bandana was a gang identifier for the Nine

Trey Gangsters. (Tr. 17.) Nine Trey Gangsters members would tie a red bandana to a firearm before a shooting to represent the gang during the shooting. (*Id.*)

After the search, Bowles-Griffin, Tashied Reed, Asberry, Wajzim Reed, and Anderson were arrested. (Tr. 117.) TFO Murdock swore out arrests warrants for each of the five suspects by video teleconference with a Fulton County judge.[5] (Tr. 167-74); [Doc. 853-2 at 15-36]. In the written warrant applications, TFO Murdock referred to a "confidential/reliable informant with excellent access," also described as a "confidential/reliable source," that revealed that Nine Trey Gangsters members had been the target of a burglary and were planning to shoot Sellio in retaliation. [*See* Doc. 853-2 at 15-16.] TFO Murdock indicated that the "confidential/reliable informant told investigators that [Tashied Reed, Asberry, and Bowles-Griffin] would be traveling with firearms from [redacted address] to the Mechanicsville area of Atlanta in order to shoot up a house where the gang members believed [Sellio] would be." [*Id.* at 16.] Further, TFO Murdock indicated that investigators had observed Bowles-Griffin pick up Tashied Reed and a firearm and had observed the meeting with Asberry and others in a separate car. After the cars were stopped,

---

[5] The application for Asberry's arrest is not in the record [Doc. 853-2 at 15-24] (Tr. 171), but it is substantially the same as the other four warrant applications (Tr. 171).

firearms, ammunition, and a small amount of marijuana was recovered.  [*Id.*]  TFO Murdock testified at the hearing that he told the judge during his warrant presentation that the source of information in the investigation was a wiretap.  (Tr. 175, 188.)

### B.   Analysis

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.  A traffic stop is constitutional if it is based upon either probable cause to believe a traffic violation has occurred or reasonable suspicion in accordance with *Terry v. Ohio*, 392 U.S. 1 (1968).  *United States v. Harris*, 526 F.3d 1334, 1337 (11th Cir. 2008).  A brief investigative stop under *Terry* is justified when officers have a "'reasonable, articulable suspicion based on objective facts that' an individual is engaged in criminal activity," based on the totality of the circumstances.  *Id.* (quoting *United States v. Powell*, 222 F.3d 913, 917 (11th Cir. 2000)).

Here, the Court readily concludes that police had reasonable suspicion under *Terry* to justify the traffic stop.  Police had wiretap evidence corroborated by visual surveillance of the Billy Spot indicating that Bowles-Griffin, Tashied Reed, and

15

Asberry were on their way to the Good Fellas house, where they were planning to shoot the occupants or otherwise threaten violence in order to retrieve their stolen money.  Asberry argues that the government did not present any probative evidence that the investigators relied on the wiretapped calls to provide probable cause for the vehicle searches because the government did not present testimony from any of the witnesses in the wiretap room.  [Doc. 970 at 10-13; Doc. 971 at 2-4.]  That argument is without merit.  Detective Belknap and Special Agent Early were both familiar with the wiretap investigation into the Nine Trey Gangsters, having sat shifts in the wire room.  (Tr. 6, 102-03.)  And both Detective Belknap and Special Agent Early testified that the investigative team was relying on information overheard in the wiretaps when they intervened in the planned shooting by calling for a traffic stop.  (Tr. 6-7, 104-05.)

Asberry also challenges the government's "interpretation" of the wiretaps, arguing that the substance of the calls was benign or ambiguous at worst, and the government's interpretation of the calls was speculative.  [Doc. 970 at 3-7.]  But the Court is not persuaded that investigators' and the government's interpretations of the wiretap were incorrect, much less unreasonable.  Special Agent Early and Detective Belknap testified that investigators believed, based on the wiretaps, that

16

the Nine Trey Gangsters were planning a retaliatory shooting. (Tr. 6-7, 104.) The government's description of the calls in its brief is consistent with Special Agent Early and Detective Belknap's description of those calls, albeit more detailed. [*See* Doc. 896 at 3-8.] The government's description of the calls is also consistent with the Court's own review of the transcripts. Beginning with the first phone call between Clark and Riley on September 26, 2016, there are several references to Asberry obtaining a "stick" to assist Tashied Reed. Special Agent Early testified that the term "stick" referred to a firearm. (Tr. 115, 155.). Further, Asberry was not necessarily bringing a firearm for Tashied Reed's protection, as Asberry argues. [Doc. 970 at 4-5.] Tashied Reed indicated that he planned to kill Sellio, or at least wanted to kill him, and Clark and Riley encouraged other members to accompany them with firearms with the intent to "shatter" the Good Fellas house with bullets. Also, when Bowles-Griffin went to the Billy Spot and other Nine Trey Gangsters members placed an item in her car, investigators reasonably (and correctly) surmised that she had picked up a gun.[6] In sum, the Court finds that the information

_____

[6] Asberry argues that the surveillance is irrelevant because the investigators testified that probable cause was based "entirely on the recorded phone calls." [Doc. 970 at 13 n.1.] An individual officer's assessment of why a search or seizure is lawful is not relevant here. Whether a stop is supported by reasonable suspicion is an objective determination based on the totality of the circumstances, *see Harris*,

conveyed to Detective Belknap and Special Agent Early from the wire room and other surveillance is corroborated by the transcripts of the wiretapped calls. Investigators reasonably concluded, based on that information, that the Nine Trey Gangsters members were organizing their members and gathering firearms for a shooting at the Good Fellas house.  In sum, the Court concludes that that the traffic stop was justified by reasonable suspicion under *Terry*.

Having concluded that the stop was lawful at the outset, the next question for the Court is whether the subsequent warrantless search of the Cadillac was lawful.    Under the automobile exception to the warrant requirement, law enforcement may conduct a warrantless search of a vehicle if (1) it is readily mobile and (2) law enforcement has probable cause for the search.  *United States v. Lindsey*, 482 F.3d 1285, 1293 (11th Cir. 2007).   A vehicle is "readily mobile" if it is operational.  *Id.*  Probable cause exists for a search where, under the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found in the vehicle to be searched.  *Id.*

---

526 F.3d at 1338, and the collective knowledge of the officers, *see United States v. Nunez*, 455 F.3d 1223, 1226 (11th Cir. 2006).   At the time of the traffic stop, investigators were aware of what the surveillance team at the Billy Spot had observed.  (Tr. 10, 108-09.)

Here, the Cadillac was clearly "readily mobile," as investigators observed the car driving through Summerhill.  Moreover, there was a fair probability, based on the information law enforcement learned from the wiretap and surveillance, that the Cadillac contained firearms and ammunition—which constituted evidence that Asberry and the other occupants of the car were going to conduct a retaliatory shooting at the Good Fellas house.  On the wiretap, the Nine Trey Gangsters repeatedly referred to the fact that Asberry was bringing a firearm with him.  What's more, officers observed ammunition and an assault rifle magazine in plain view in the car.  Investigators therefore had probable cause to search the car for firearms and ammunition and lawfully seized physical evidence of the planned shooting and other contraband.

Asberry argues that TFO Murdock "fabricat[ed]" the existence of an informant in the arrest warrant applications.  TFO Murdock's written statement characterizing investigators' source of information as an "informant" rather than a "source" was confusing, but he testified that he explained to the judge who issued the arrest warrants that the source of information for the investigation was a wiretap. (Tr. 175, 188.)  The Court finds that testimony credible.  Furthermore, even if the arrest warrants were somehow defective, the warrants were issued after the lawful

19

search of the Cadillac.  In the context of the Fourth Amendment, the exclusionary rule encompasses primary evidence found as a result of an illegal search and the "fruit of the poisonous tree," evidence derivative of the illegal search.  *Utah v. Strieff*, 136 S. Ct. 2056, 2061 (2016).  Here, the allegedly "fabricated" evidence was in issue after the lawful search of the Cadillac; the evidence seized during the car search cannot be said to be the fruit of the poisonous tree for purposes of the exclusionary rule.

For the foregoing reasons, it is **RECOMMENDED** that the motion to suppress be **DENIED**.  [Doc. 636.]

## III.   MOTION FOR BILL OF PARTICULARS

In his motion for bill of particulars, Asberry argues that he is entitled to the following information:

1) The name of every individual in the indictment identified only by initials and the contact information for such individuals;

2) As to Overt Act 17, which alleges that Asberry was directed to call M.M. regarding acquiring heroin, the identity of M.M., whether any heroin was seized and tested; and whether a heroin transaction ever occurred;

3) As to Overt Act 26, which alleges that a co-defendant sold Asberry drugs on credit, where and how Asberry received those "drugs" and whether any portion of the drugs was seized or tested;

4) As to Overt Act 50, which alleges that a co-defendant sold Asberry Xanax pills, where and how Asberry bought those pills, the quantity he bought, and whether any portion of the pills was seized or tested;

5) For purposes of the sentencing enhancement for Count 1, the name of the person Asberry and others allegedly murdered or intended to murder and his alleged role in the murder;

6) As to Count 7, which alleges that Asberry and others conspired to murder Good Fellas gang members, the identities of any gang members he and others conspired to murder; and

7) As to Count 8, which alleges that Asberry and others conspired to distribute controlled substances, the specific drugs Asberry conspired to distribute, the person or persons he conspired with, and the overt acts committed in furtherance of the conspiracy.

[Doc. 635 at 3-7.] Asberry anticipates that the government will argue that the identifies of such individuals can be ascertained by reviewing the discovery

material.  [*Id.* at 4.]  But Asberry argues that he should not have to waste his time identifying individuals in the indictment when the government can easily and readily provide that information.  [*Id.*]

The government responds that Asberry's motion is an impermissible attempt to compel the government to disclose its theory of the case, the evidence it intends to use at trial, and the identities of witnesses it intends to call at trial.  [Doc. 763 at 3, 12-14.]  The government also points out that, as to the RICO conspiracy charge, it is not required to prove any overt acts.  [*Id.* at 3-4.]  Regarding Asberry's specific requests, the government states that it has produced material in discovery from which the identities of individuals referred to by their initials in the indictment can be surmised.  [*Id.* at 12.]  The government also points out that many of the overt acts do not involve Asberry, and Asberry has cited no authority indicating that he is entitled to contact information for persons referenced in the indictment.  [*Id.* at 12-13.]  As to Asberry's requests for information about the overt acts, the government directs him to specific intercepted calls in which drug transactions are discussed.  [*Id.* at 13-14.]  The government also states that the drugs at issue in Overt Acts 17 and 50 were neither seized nor tested and that the drugs at issue in

Overt Act 26 were not tested.[7]  [*Id.*]  As to the notice of enhanced sentencing, the government refers the defense to the conduct alleged in Counts 2 through 7, which concern attempted VICAR murder and VICAR murder conspiracies.  [*Id.* at 14.] Finally, regarding Counts 7 and 8, the government argues that Asberry has not characterized the allegations in those counts correctly and refers the defense to the conduct alleged in Count 7 and Overt Acts 17, 26, and 50.  [*Id.*]

Federal Rule of Criminal Procedure 7(f) provides that:

> The court may direct the government to file a bill of particulars.  The defendant may move for a bill of particulars before or within 14 days after arraignment or at a later time if the court permits.  The government may amend a bill of particulars subject to such conditions as justice requires.

Fed. R. Crim. P. 7(f).  "The purpose of a bill of particulars is to inform the defendant of the charge against him with sufficient precision to allow him to prepare his defense, to minimize surprise at trial, and to enable him to plead double jeopardy in the event of a later prosecution for the same offense."  *United States v. Davis*, 854 F.3d 1276, 1293 (11th Cir.) (quotation omitted), *cert. denied*, 138 S. Ct. 379 (2017).  A bill of particulars may not be used for the purpose of obtaining detailed

---

[7] The government does not state whether the substance at issue in Overt Act 26 was seized.

disclosure of the government's case or evidence in advance of trial. *See United States v. Perez*, 489 F.2d 51, 70-71 (5th Cir. 1973). "Nor is the defendant entitled to a bill of particulars with respect to information which is already available through other sources such as the indictment or discovery and inspection." *United States v. Rosenthal*, 793 F.2d 1214, 1227 (11th Cir.), *modified on other grounds by*, 801 F.2d 378 (11th Cir. 1986).

For starters, only four individuals are identified by initials in portions of the indictment that relate to Asberry: M.M., S.C., Y.G., and A.A. Those individuals are identified only in overt acts of the RICO conspiracy which, for the reasons discussed below, are not the proper subjects of a bill of particulars. In any event, the government points out that Asberry can identify any individual identified by initials by referring to intercepted phone calls that have been disclosed in discovery. Asberry specifically requests M.M.'s identity, and the government has directed him to specific material disclosed in discovery that contains M.M.'s identity. The Court is not persuaded that reviewing the discovery material that concerns Asberry— particularly wiretapped calls on which he was intercepted—will constitute a "waste of valuable time and resources" in preparing his defense. [*See* Doc. 635 at 4.] Asberry also has cited no authority suggesting that he is entitled to the identities of

individuals in the counts of the indictment in which he is not charged or to contact information for all individuals identified by their initials.

Asberry's requests for additional information about the overt acts described in Count 1 of the superseding indictment are also due to be denied.  Overt acts are not elements of a RICO conspiracy.  *See Salinas v. United States*, 522 U.S. 52, 64 (1997) ("The RICO conspiracy statute, § 1962(d), broadened conspiracy coverage by omitting the requirement of an overt act . . . .").  It follows, therefore, that overt acts alleged in an indictment are not the proper subject of a motion for a bill of particulars.  *United States v. Henley*, No. 1:16-cr-151-LMM-JFK, 2017 WL 2952821, at *16 (N.D. Ga. May 19, 2017) (denying motion for bill of particulars seeking details concerning overt acts taken in furtherance of extortion and drug conspiracies), *report and recommendation adopted*, 2017 WL 2918954 (N.D. Ga. July 7, 2017); *United States v. Leiva-Portillo*, No. 1:06-CR-350-WSD, 2007 WL 1706351, at *15 (N.D. Ga. June 12, 2007) ("Case law is also clear that the Government is not required to identify . . . specific acts or overt acts done in furtherance of a charged conspiracy by particular defendants.").  Moreover, the overt acts are sufficiently well described to give Asberry notice of the alleged

conduct, and the government has referred Asberry to discovery material that will give him additional information about the overt acts.

As to the sentencing enhancement in Count 1, the government has referred Asberry to the conduct alleged in Counts 2 through 7, which are the VICAR attempted murder and VICAR murder conspiracy charges. Although the notice provisions do not set out the specific actions that Asberry allegedly undertook, the indictment itself contains detail regarding the alleged murder charges. The Court is satisfied that, with respect to the notice of enhanced sentencing, the government has provided sufficient information to enable Asberry to understand the government's theory. In addition, the VICAR charges in Counts 2 through 7 relate to alleged conduct described in greater detail in Count 1.

Asberry's request for additional information about Count 7 is due to be denied because the superseding indictment provides adequate notice of the charge of VICAR murder conspiracy, including the date and the intended victims of the murder conspiracy. The conduct at issue in Count 7 is also described in more detail in Count 1 of the indictment. Asberry argues that he is entitled to the names of the intended victims, but the names of the intended victims may not be known, and that information is not essential to the preparation of his defense.

Finally, Asberry is not entitled to additional information about the drug distribution and possession conspiracy alleged in Count 8.  Count 8 provides the approximate dates of the conspiracy, the location of the conspiracy, and the substances involved.  The government also refers Asberry to Overt Acts 17, 26, and 50, which provide more information about Asberry's specific role in the conspiracy.  While additional information about specific drug transactions may be helpful to Asberry, he has failed to carry his burden to demonstrate that additional details are necessary to enable him to prepare his defense, avoid surprise, or plead double jeopardy in a subsequent proceeding.  *See United States v. Giffen*, 379 F. Supp. 2d 337, 346 (S.D.N.Y. 2004) ("The ultimate test in deciding whether a bill of particulars should be ordered is whether the information sought is necessary, as opposed to helpful, in preparing a defense."); *see also Henley*, 2017 WL 2952821, at *16.

For the foregoing reasons, Asberry's motion for a bill of particulars is **DENIED**.  [Doc. 635.]

## IV.   MOTION FOR TIMELY DISCLOSURE OF DEALS AND INFORMATION ABOUT GOVERNMENT WITNESSES AND MOTION FOR DISCLOSURE OF CONFIDENTIAL INFORMANTS

In his Motion for Timely Disclosure of Deals and Information About Government Witnesses, Asberry requests that the Court order the government to timely disclose any deal or agreement between the government and prosecution witnesses, including government promises not to prosecute or to recommend leniency.  [Doc. 637 at 1-4.]  Asberry also argues that the government should identify each witness and the witness's relationship to Asberry as well as the "full name, alias names, address, phone number, date of birth, social security number, immigration number, and criminal history" of each witness.  [*Id.* at 4.]  He further requests the following information about each government witness: federal agency files; criminal record; psychological and psychiatric history; deceptive or inconclusive polygraph results; documentation of deals with the government; payment records and federal income tax records showing benefits received by the witness from the government.  [*Id.* at 5-6.]  Asberry acknowledges that the government may provide some of the requested information "shortly before or

during trial" as part of its Jencks Act[8] and *Giglio*[9] obligations, but he argues that "an untimely disclosure" will not give him sufficient time to identify related witnesses, locate impeaching evidence, or prepare for trial.  [*Id.* at 4.]  He asks that the Court order the government to make the disclosures at least 45 days before trial.  [*Id.* at 5.]

In his motion for disclosure of confidential informants, Asberry argues that the Court should compel the government to fully disclose the identity of each confidential informant who is a material witness and/or participant in the offenses charged against him.  [Doc. 638 at 1.]  He also seeks information about each confidential informant's deal with the government, production of each confidential informant's grand jury testimony, and the whereabouts of each confidential informant.  [*Id.* at 1, 8-11.]  Asberry anticipates that each confidential informant would be a critical witness at trial and notes that he may assert an entrapment defense.  [*Id.* at 3.]  He argues that, at present, even if he could identify a confidential informant by name, he does not have enough information to fully identify and contact that witness or sufficient information about the witness's

---

[8] 18 U.S.C. § 3500.

[9] *Giglio v. United States*, 405 U.S. 150 (1972).

background and credibility.  [*Id.* at 6-7.]  Asberry requests that the Court order the government to make the requested disclosures at least 45 days before trial and to make confidential informants available for him to interview at least 30 days before trial.  [*Id.*at 11-12.]

In these two motions, Asberry is requesting four categories of information: early Jencks material; the government's witness list (and other information about each witness); early *Giglio* disclosures; and disclosure of confidential informants. The Court addresses each category of information below.

### A.     Early Jencks Disclosure

The Jencks Act provides in relevant part as follows:

> ***After a witness called by the United States has testified on direct examination***, the court shall, on motion of the defendant, order the United States to produce any statement (as hereinafter defined) of the witness in the possession of the United States which relates to the subject matter as to which the ***witness has testified***. If the entire contents of any such statement relate to the subject matter of the testimony of the witness, the court shall order it to be delivered directly to the defendant for his examination and use.

18 U.S.C. § 3500(b) (emphasis added).  Asberry requests that the government be ordered to disclose Jencks materials 45 days before trial so that he may adequately prepare his defense.  [Doc. 638 at 8-10, 13.]  The government responds that the Court is not authorized to require the government to disclose Jencks material early,

but in any event, it plans to disclose Jencks material 14 days before the witness testifies.  [Doc. 762 at 6 & n.1, 7, 9-10.]

The government is correct that, under the Jencks Act, the Court is not authorized to order an early Jencks disclosure.  The Jencks Act requires that a witness statement be produced only after the witness testifies.  18 U.S.C. § 3500(b).  The Jencks Act provides no authority for the Court to grant an early release or disclosure of that material.  *See United States v. Liuzzo*, 739 F.2d 541, 544 (11th Cir. 1984); *see also United States v. Jordan,* 316 F.3d 1215, 1227 n.17, 1251 & n.78 (11th Cir. 2003); *United States v. Calderon*, 127 F.3d 1314, 1335 (11th Cir. 1997); *United States v. Jones,* No. 1:05-CR-617-WSD, 2007 WL 2071267, at *14 (N.D. Ga. July 19, 2007) ("The Jencks Act materials . . . are not subject to disclosure until the government witness testifies at trial on direct examination, or earlier if the government agrees."), *adopted at *3-4.

Asberry has cited no authority suggesting that he is entitled to early Jencks disclosure.  Instead, he argues that he is entitled to the early disclosure of confidential informants' grand jury testimony under Rule 6(e) of the Federal Rules of Criminal Procedure.  [Doc. 638 at 8-10.]  Federal Rule of Criminal Procedure 6(e) codifies the traditional rule of grand jury secrecy.  *United States v. Aisenberg*,

358 F.3d 1327, 1346-47 (11th Cir. 2004); *see also Douglas Oil Co. of Cal. v. Petrol Stops Nw.*, 441 U.S. 211, 218-19 (1979) (discussing why "the proper functioning of our grand jury system depends upon the secrecy of grand jury proceedings").  In limited circumstances, however, the Court may order disclosure of grand jury materials.  Fed. R. Crim. P. 6(e)(3); *Aisenberg*, 358 F.3d at 1347-48.  The Court may order disclosure of grand jury materials, *inter alia*, preliminary to or in connection with a judicial proceeding, but only where the party seeking disclosure shows a "particularized need" for the material.  *Aisenberg*, 358 F.3d at 1348; *see also United States v. Abusaid*, 256 F. App'x 289, 290 (11th Cir 2007).  A blanket request for all grand jury materials does not satisfy the "particularized need" requirement.  *Aisenberg*, 358 F.3d at 1348-49 (explaining that "particularized need" may be shown by circumstances creating difficulties "peculiar to this case, which could be alleviated by access to *specific* grand jury materials, without doing disproportionate harm to the salutary purpose of secrecy embodied in the grand jury process").

Under the Jencks Act, Asberry will be entitled to the grand jury testimony of confidential informants who testify at trial.  The Court is not convinced, however, that Rule 6(e)'s limited exceptions to the rule of grand jury secrecy are otherwise a

vehicle for early Jencks disclosure.  Asberry also has requested the grand jury testimony of every confidential informant so that the can attack the witnesses' credibility and consider whether to assert an entrapment defense.  This is the sort of blanket request that does not satisfy the "particularized need" requirement for the disclosure of grand jury testimony.  Rather, Asberry wishes to sift through the grand jury testimony at large to see what may be useful to his defense.  The need for secrecy is substantial in this case as well, given the allegations in the indictment about violent, retaliatory actions taken against people cooperating with law enforcement.  [*See* Doc. 33 at 6, 16-17, 21.]  Asberry's request for early Jencks material under Rule 6(e) is therefore without merit.

## B.    The Government's Witness List

Asberry next argues that he is entitled to a list of the government's witnesses and their contact information 45 days before trial.  [Doc. 637 at 4, 7.]  The government responds that Asberry has no right to early disclosure of its witness list, and there is a substantial risk of harm to witnesses should their identities be disclosed prematurely.  [Doc. 762 at 6.]

It is well-settled that a criminal defendant has no constitutional right to witness lists or witness statements before trial.  *Weatherford v. Bursey*, 429 U.S.

545, 559 (1977) ("It does not follow from the prohibition against concealing evidence favorable to the accused that the prosecution must reveal before trial the names of all witnesses who will testify unfavorably."); *see also United States v. Johnson*, 713 F.2d 654, 659 (11th Cir. 1983) ("A criminal defendant has no absolute right to a list of the government's witnesses in advance of the trial.").  Nor does Federal Rule of Criminal Procedure 16 require the disclosure of the identities of government witnesses.  *See United States v. Aiken*, 76 F. Supp. 2d 1339, 1343 (S.D. Fla. 1999) ("Under [Rule 16], there is no authority requiring the Government to supply witness lists or witness statements until that witness has testified on direct examination, unless such information is required sooner by *Brady*[10] or *Giglio*.").

The Court nonetheless has discretion to require the production of witness lists in advance of trial.  *See United States v. Elder*, No. 1:10-CR-132-RWS-AJB, 2010 WL 5656687, at *6 (N.D. Ga. Dec. 16, 2010), *report and recommendation adopted in relevant part*, 2011 WL 294507 (N.D. Ga. Jan. 27, 2011).  "To obtain a witness list, a defendant must show that the 'list would be material to the preparation of the defense.'"  *Id.* (quoting *Downing v. United States*, 348 F.2d 594, 599 (5th Cir. 1965)).  The Eleventh Circuit has held that a defendant could not

---

[10] *Brady v. Maryland*, 373 U.S. 83 (1963).

show that a witness list was material to the preparation of his defense where the witnesses were persons with whom he had "significant personal or financial relations." *See United States v. Colson*, 662 F.2d 1389, 1392 (11th Cir. 1981).

Although the Court appreciates that Asberry wants to prepare to cross-examine the government's witnesses effectively, that concern alone does not entitle him to a list of the government's witnesses. Furthermore, Asberry is primarily concerned about confidential informants and other cooperating sources, but those witnesses are likely individuals with whom he has "significant personal . . . relations." *See Colson*, 662 F.2d at 1392. In addition, Asberry will receive information about some of the government's witnesses through the government's Jencks Act disclosure, giving him two weeks to prepare his defense with respect to those witnesses. Accordingly, the Court will not require early disclosure of the government's witness list. *See United States v. Pineda*, No. 1:11-CR-006-CAP-JFK, 2012 WL 2906758, at *44 (N.D. Ga. June 4, 2012) (denying request for pretrial disclosure of the government's confidential informants on similar grounds), *adopted by* 2012 WL 2907447, at *1 (N.D. Ga. July 16, 2012).

### C.    Early *Giglio* Disclosure

Asberry also requests that the Court order the government to make an early disclosure of impeachment material 45 days before trial.  [Doc. 637 at 3-6; Doc. 638 at 8.]  The government responds that there is no right to early disclosure of *Giglio* material.  [Doc. 762 at 6.]  The government adds that it understands its *Brady* obligations and will disclose *Giglio* material for testifying informants at the time Jencks material is released, 14 days before trial.  [*Id.* at 6-7, 10.]  The government also objects to producing *Giglio* material because early disclosure of such material, as with early disclosure of the government's witness list, may endanger the safety of witnesses.  [*Id.* at 6.]

"A defendant does not generally have a right to early disclosure of impeaching information," and here, the government's "agreement to abide by its *Brady*, Jencks and *Giglio* obligations . . . [is] sufficient."  *Pineda*, 2012 WL 2906758, at *44 (citation omitted).  Additionally, the Court's pretrial scheduling order directs the government to produce provide all materials and information in compliance with its obligations under *Giglio*.  [Doc. 240 at 6.]  The scheduling order further provides that a party can request a modification of this standard ruling by filing a particularized motion for relief.  [*Id.* at 5.]  Although Asberry is specific

about the type of information he is seeking, he has not shown why early disclosure of that information is required.  The government's agreement to disclose *Giglio* material approximately two weeks before trial should give Asberry ample time to prepare his defense, including his cross-examination of cooperating witnesses.  The Court reminds the government of its *Giglio* and *Brady* obligations, but it will not order early disclosure of *Giglio* material or order disclosure of witnesses' contact information before trial.

### D.    Confidential Informants and Related Information

Asberry seeks the disclosure of confidential informant—including non-testifying informants—and their contact information under *Roviaro v. United States*, 353 U.S. 53 (1957).  [Doc. 638.]  The government argues that *Roviaro* does not compel the disclosure of confidential informants here because the government intends to call its confidential informants and sources as witnesses at trial.  [Doc. 762 at 3-6.]

It is well-established that the government has a limited privilege to withhold the identity of law enforcement informants.  *Roviaro v. United States*, 353 U.S. 53, 59 (1957).  The purpose of this privilege "is the furtherance and protection of the public interest in effective law enforcement."  *Id.*  But where the disclosure of an

37

informant's identity or the contents of his communication is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the trial court may require disclosure. *Id*. at 60-61. In balancing these interests, the Court must account for "the particular circumstances of each case, the crime charged, possible defenses, and the potential significance of the informant's testimony." *United States v. Gutierrez*, 931 F.2d 1482, 1490 (11th Cir. 1991). Courts in this Circuit consider the following three factors in evaluating whether the government should be required to reveal the identity of informants: "(1) the extent of the CI's participation in the criminal activity; (2) the directness of the relationship between the defendant's asserted defense and the probable testimony of the CI; and (3) the government's interest in nondisclosure." *United States v. Razz*, 240 F. App'x 844, 847 (11th Cir. 2007) (citing *Gutierrez*, 931 F.2d at 1490).

The concerns in *Roviaro* are generally inapplicable where the government intends to call the informant as a witness at trial. *See Banks v. Dretke*, 540 U.S. 668, 697 (2004) ("The issue of evidentiary law in *Roviaro* was whether (or when) the Government is obliged to reveal the identity of an undercover informer the Government does *not* call as a trial witness."); *United States v. Rook*, No. 1:15-CR-380-SCJ, 2016 WL 2344877, at *3 (N.D. Ga. May 3, 2016); *Pineda*, 2012 WL

38

2906758, at *44.  Here, the government has indicated that it intends to call its confidential informants as witnesses during the trial and will disclose prior to trial the identity of the informant and any related Jencks and *Giglio* materials.  [Doc. 762 at 6, 10.]  In light of this representation, the Court will not require the government to disclose the identity of such confidential informants at this time.

Based on the foregoing, Asberry's Motion for Timely Disclosure of Deals and Information About Government Witnesses [Doc. 637] and his Motion for Timely Disclosure of Confidential Informants with Related Evidence [Doc. 638] are **DENIED**.

## V.    MOTION TO STRIKE SURPLUSAGE

In his motion to strike surplusage, Asberry argues that the Court should strike numerous sections of the superseding indictment as immaterial and prejudicial. [Doc. 639.]  Federal Rule of Criminal Procedure 7(d) grants the Court the authority to strike surplusage from an indictment upon a defendant's motion.  Fed. R. Crim. P. 7(d); *see United States v. Awan*, 966 F.2d 1415, 1426 (11th Cir. 1992); *United States v. Huppert*, 917 F.2d 507, 511 (11th Cir. 1990), *superseded by statute on other grounds as stated in United States v. McQueen*, 86 F.3d 180, 183-84 (11th Cir. 1996).  The standard for striking surplusage is "exacting"; allegations should

not be excised from an indictment "unless it is clear that the allegations are not relevant to the charge and are inflammatory and prejudicial." *Awan*, 966 F.2d at 1426 (quotation omitted). "Thus, to prevail on a motion to strike surplusage, a defendant must show, first, that the contested portions of the indictment are irrelevant to the charged crimes, and, second, that the challenged language is unfairly prejudicial or inflammatory." *United States v. Anyanwu*, No. 1:12-CR-190-TWT-ECS, 2013 WL 1558712, at *4 (N.D. Ga. Mar. 12, 2013), *report and recommendation adopted*, 2013 WL 1561011 (N.D. Ga. Apr. 12, 2013). The Court may also reserve ruling on a motion to strike surplusage until hearing the evidence and determining its relevance at trial. *See Awan*, 966 F.2d at 1426.

Asberry first argues that the Court should strike the "Background" section of Count 1 as immaterial because it merely explains the government's theory about how the Nine Trey Gangsters gang was formed, how it operated, and terms used by gang members. [Doc. 639 at 3.] Asberry further argues that the Court should strike the "Background" section and the section of the superseding indictment entitled "The Enterprise & Purposes of the Enterprise" as prejudicial because they will "essentially provide an opening statement for the Government at trial." [*Id.* at 3-4.] Additionally, Asberry argues that the section of Count 1 styled "Manner and

Means of the Conspiracy" "rambles on about how [Nine Trey Gangsters] members generally conducted business and committed crimes" but is unrelated to the specific allegations of criminal activity made elsewhere in the superseding indictment.

In his reply brief, Asberry also argues that the government does not have to prove the origins of the Nine Trey Gangsters organization on a national scale and "is limited to proving how the named defendants in this case actually said and how they acted." [Doc. 791 at 3.] Asberry cites no authority for his contention that the government cannot—in a trial about a criminal organization—introduce evidence about the organization's origins and national activities.

The Court readily concludes that those introductory sections of the superseding indictment are relevant to the crimes charged in the superseding indictment and are particularly relevant to Count 1. Asberry argues that the Background and Manner and Means sections merely state the government's theories about the operations of the Nine Trey Gangsters, but the government must prove the existence of an enterprise as an element of the RICO conspiracy charge at issue here, *see United States v. Espinoza*, 635 F. App'x 739, 749 n.9 (11th Cir. 2015); *United States v. Browne*, 505 F.3d 1229, 1257 (11th Cir. 2007), and may do this "'by evidence of an ongoing organization, formal or informal, and by evidence

41

that the various associates function as a continuing unit,'" *Boyle v. United States*, 556 U.S. 938, 945 (2009) (quoting *United States v. Turkette*, 452 U.S. 576, 583 (1981)).  Accordingly, the Court cannot say that information about how the alleged enterprise came into being and operates is immaterial to this case.  Because the allegations in those sections are legally relevant to the RICO charge, Asberry's argument that the allegations are prejudicial is of no moment.  *See Anyanwu*, 2013 WL 1558712, at *4.

Asberry also argues that the Court should strike from the superseding indictment six of the eight overt acts involving him.  Specifically, Asberry argues that the Court should strike Overt Acts 17, 26, 35, 42, 50, and 87 as inflammatory, prejudicial, and unrelated to any alleged criminal activity.  [Doc. 639 at 5-7.]  He specifically contends that the overt acts are unrelated to drug distribution, any "substantive count of the indictment," or the alleged conspiracy.  [*Id.* at 7.]

Asberry's argument is without merit.  As stated above, the government must establish, as part of its RICO conspiracy case, the existence of an organization.  The Government must establish an individual defendant's participation in an alleged RICO conspiracy, either: "(1) by showing an agreement on an overall objective, or (2) . . . by showing that a defendant agreed personally to commit two predicate acts

and therefore to participate in a 'single objective' conspiracy." *United States v. Starrett*, 55 F.3d 1525, 1544 (11th Cir. 1995) (alteration in original) (quotation omitted). "The government can prove an agreement on an overall objective by circumstantial evidence showing that each defendant must necessarily have known that others were also conspiring to participate in the same enterprise through a pattern of racketeering activity." *Id.* (quotation omitted). Although the government does not necessarily need to prove any overt act, *see Salinas*, 522 U.S. at 64, the information in the overt acts is relevant to the showing the government must make about Asberry's participation in the RICO conspiracy. The overt acts that Asberry challenges are legally relevant to his alleged participation in the Nine Trey Gangsters gang, and the Court therefore concludes that those allegations are not surplusage.[11]

It is therefore **RECOMMENDED** that Asberry's motion to strike surplusage be **DENIED**.  [Doc. 639.]

---

[11] Asberry also refers to the section of Count 1 entitled "The Racketeering Conspiracy" and Overt Acts 95 and 97 in his motion to strike surplusage but does not object to those sections as surplusage.  [Doc. 639 at 4.]

## VI.   CONCLUSION

For the foregoing reasons, it is **RECOMMENDED** that the Motion to Suppress Physical Evidence [Doc. 636] and the Motion to Strike Surplusage [Doc. 639] be **DENIED**.  It is further **ORDERED** that the Motion for Bill of Particulars [Doc. 635], the Motion for Timely Disclosure of Deals and Information About Government Witnesses [Doc. 637], and the Motion for Timely Disclosure of Confidential Informants with Related Evidence [Doc. 638] be **DENIED**.

It is further noted that, in an order dated October 19, 2018 [Doc. 799 at 2 n.2], the Court granted Asberry's motion to adopt Defendant Mitchell's Motion to Modify Protective Order [Doc. 770].  The Clerk is **DIRECTED** to correct the docket to reflect the entry of that order.

I have now addressed all referred pretrial matters relating to Defendant Asberry and have not been advised of any impediments to the scheduling of a trial.

Accordingly, this case is **CERTIFIED READY FOR TRIAL** as to this defendant.[12]

IT IS SO ORDERED and RECOMMENDED this 1st day of August, 2019.

_____
JOHN K. LARKINS III
United States Magistrate Judge

---

[12] Since matters pertaining to Asberry's co-defendants still are pending, the District Court is not required to place his case on the trial calendar at this time.  18 U.S.C. § 3161(h)(6).